**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CBM MINISTRIES OF SOUTH** | : | **CIVIL ACTION NO. 1:15-CV-2147** |
| **CENTRAL PENNSYLVANIA, INC.,** | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT** | : | |
| **OF TRANSPORTATION AND** | : | |
| **PENNSYLVANIA STATE POLICE,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

The instant motion (Doc. 8) for preliminary injunctive relief is filed by

plaintiff CBM Ministries of South Central Pennsylvania, Inc. ("CBM").  CBM seeks

to enjoin the Pennsylvania Department of Transportation ("PennDOT") and the

Pennsylvania State Police ("State Police") (collectively, "defendants") from

enforcing state regulations governing school bus safety against CBM's vehicles.

The court will grant CBM's motion.

I.      **Background**

CBM commenced this matter with the filing of a three-count complaint,

contemporaneous with a motion for preliminary injunction, on October 26, 2015 in

the Court of Common Pleas of Franklin County.  (See Doc. 1 at 6-21).  On November

10, 2015, defendants removed the case to this court, pursuant to 28 U.S.C. § 1441.

(See id. at 2-4).

CBM brings causes of action under the Pennsylvania Declaratory Judgments Act, 42 PA. CONS. STAT. § 7531 *et seq.*; the Pennsylvania Religious Freedom Protection Act, 71 PA. CONS. STAT. §§ 2401-07; and the Establishment Clause of the First Amendment, U.S. CONST. amend. I.  (Doc. 1 ¶¶ 35-54).  CBM seeks permanent injunctive relief enjoining the enforcement of Pennsylvania school bus safety regulations against CBM.  (Id. ¶¶ 36, 47, 54).  CBM additionally petitions the court for declaratory judgment that: (1) 67 PA. CODE § 171 is unconstitutional as applied; (2) CBM's vehicles are not subject to the school bus safety regulations promulgated under 75 PA. CONS. STAT. § 4551; (3) CBM's vehicles "are not 'school buses' under the definition in 67 PA. CODE § 171;" and (4) CBM's "drivers are not required to seek 'S' endorsements on their licenses."  (Id. ¶ 36).  Finally, CBM seeks nominal damages for alleged violations of its First Amendment rights, as well as costs and attorneys fees.  (Id. ¶¶ 47, 54).

In the instant motion, CBM petitions the court to enjoin defendants "from taking any action that would require [CBM] to have its [v]ehicles comply with the regulations enabled by 75 PA. CONS. STAT. § 4551 . . . or from issuing citations to [CBM] or its agents arising from such regulations."  (Doc. 8-1).  The court held a preliminary injunction hearing on November 23, 2015, taking evidence in the form of documentary exhibits and witness testimony.  The parties filed responsive briefs in support of their respective positions subsequent to the hearing.  (See Docs. 18, 19).  With briefing concluded and the record closed, CBM's motion for preliminary injunction is ripe for disposition.

II.     **Findings of Fact**[1]

A.      **CBM's Vehicles**

CBM is a religious non-profit organization registered in Pennsylvania, doing business as Joy El Ministries.  (Tr. at 3:1-3:7, 4:9-4:10, 32:21-33:1).  CBM uses its vehicles to transport public school students to and from nearby churches for religious instruction, pursuant to Pennsylvania's release time statute, 24 PA. CONS. STAT. § 15-1546.  (Tr. at 4:15-6:25).  Under this law, students may receive off-site religious education for up to thirty-six (36) hours per academic year upon written request by a parent or guardian to the superintendent of the school district. 24 PA. CONS. STAT. § 15-1546.  CBM sponsors a total of eighty-seven such release time programs, serving approximately 3106 students enrolled in grades three through six.  (Tr. at 3:25-4:1, 28:16-28:18).  These programs are supported by 1300 CBM volunteers and are provided to students at no cost.  (Tr. at 6:10-6:16, 8:1-8:5). No contractual relationship exists between CBM and any school or school district whose students participate in its programming.  (Tr. at 8:6-8:21).  Founded in 1938, CBM has provided transportation to and from its release time sessions since 1967. (Tr. at 4:15-4:18).

CBM currently owns and operates a fleet of fourteen buses which were originally manufactured to comply with state regulations governing school buses.

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record evidence.  Citations to the record include the transcript of the preliminary injunction hearing convened on November 23, 2015 ("Tr."); CBM's exhibits introduced at the hearing ("Ex. P-"); and defendants' exhibits introduced at the hearing ("Ex. D-").

(See Ex. D-1; Tr. at 13:23-14:18, 15:15-15:20; 101:19-102:17).  In addition to supporting CBM's release time programs, these vehicles provide transportation for CBM's year-round camps, retreats, and leadership training programs.  (Tr. at 4:2-4:8, 10:1-10:7).  Various churches and contractors donated the buses to CBM. (Tr. at 13:20-13:22).  The buses are driven primarily by volunteers, each of whom possesses a commercial driver's license ("CDL") and a P endorsement, authorizing passenger transport.  (Tr. at 7:23-7:25, 12:19-12:21).  The parties do not dispute that all of CBM's buses have passed state inspection.  (Tr. at 11:10-11:14; see Ex. D-1).

On September 23, 2015, two State Police troopers conducted a spot check of a CBM bus preparing to transport students from a release time session back to school grounds.  (Tr. at 62:5-63:19, 115:22-116:7).  The troopers issued citations to both CBM and volunteer driver Ann Browder ("Ms. Browder") for violating state regulations governing school bus equipment and safety.  (Exs. P-2, P-4; Tr. at 62:5-63:20); see 67 PA. CODE § 171.  The State Police report charged CBM with, *inter alia*, (1) identifying CBM as the owner of the bus on externally visible decals, see 67 PA. CODE § 171.55; (2) failing to paint the bus "National School Bus Yellow," see id. § 171.47; and (3) failing to mark the vehicle with the words "school bus," see id. § 171.55.  (See Ex. P-2).  As a result of the incident, twelve of CBM's buses are currently grounded pending CBM's compliance with Pennsylvania Code provisions applicable to school buses.  (Tr. at 21:3-21:5).

## B.    Statutory and Regulatory Framework

Promulgated by PennDOT, the regulations at issue fall within § 171 of Title 67, which governs "school buses and school vehicles."  67 PA. CODE § 171.

4

Section 171 defines a "school bus" as follows: "[a] motor vehicle designed to carry 11 passengers or more, including the driver, and used for the transportation of preprimary, primary or secondary school students to or from public, private or parochial schools or events related to these schools or school-related activities." Id. § 171.2.  Section 171 further provides that a "multifunction school activity bus" is "[a] school bus used to transport students on field trips, athletic trips or other curricular or extracurricular activities, but not used for to-and-from school transportation."  Id.

The definitional section of the Pennsylvania Vehicle Code defines "school bus" consonant with 67 PA. CODE § 171 and does not address multifunction school activity buses.  75 PA. CONS. STAT. § 102.  The Vehicle Code directs PennDOT to promulgate regulations "governing the safe design, construction, equipment and operation of vehicles engaged in the transportation of school children."  75 PA. CONS. STAT. § 4551(a).  The same enabling provision limits PennDOT's regulatory authority over school buses to vehicles which are "owned by or under contract with any school district or parochial or private school."  Id.  Under the section detailing "[g]eneral requirements for school buses," the Vehicle Code further instructs that "the regulations established by [PennDOT] shall not require vehicles which pick up and discharge school children only at locations off the highway to be of any particular color or to display flashing red and amber lights."  Id. § 4552(h).

### C.    Preliminary Injunction Hearing

At the hearing on the instant motion, defendants clarified their position on the proper definition to be applied to CBM's vehicles, labeling the buses

"multifunction school activity buses," a subset of the class of vehicles designated "school buses." (Tr. at 86:21-87:16, 92:21-93:2). On September 23, 2015, the State Police cited CBM for its failure to adhere to certain Code provisions generally applicable to school buses from which multifunction school activity buses are excepted. (See Ex. P-2). CBM opposed the citations, and the parties have represented to the court that adjudication of the citations is stayed pending disposition of the instant matter. (Tr. at 18:9-18:23).

During the course of the hearing, defendants acknowledged that because they now assert that CBM's buses fall within the definition of multifunction school activity buses, CBM need not comply with those "requirements . . . that are relevant to stopping on the road." (Tr. at 88:22-89:22; see Tr. at 104:2-105:1; Ex. D-G). Specifically, John Zimmerman ("Mr. Zimmerman"), PennDOT's Driver Qualifications Section Manager, testified that such multifunction school activity buses "don't need the lighting system that stops traffic, the stop arm, the stop sign or cross arm, and they don't have to be yellow." (Tr. at 89:12-89:14). Defendants have thereby waived the right to enforce the corresponding Code provisions against CBM. (Tr. at 92:21-93:2).

The parties presented considerable testimony regarding the current and future consequences of requiring CBM to comply with the regulations applicable to multifunction school activity buses. Testifying for defendants, Mr. Zimmerman advised that drivers of all such vehicles must obtain "S endorsements," which specifically authorize the licensee to transport school children in school buses.

(Tr. at 94:4-94:6; <u>see</u> Tr. at 25:17-26:2).  Mr. Zimmerman elucidated the steps

necessary for a driver who is already in possession of a CDL and a P endorsement

to obtain an S endorsement: to wit, seven hours of classroom training; three hours

of one-on-one driving training; a physical exam; and ten additional hours of

classroom training within 120 days of satisfying the foregoing requirements.  (Tr. at

94:7-96:12).  According to Mr. Zimmerman, within a span of two weeks, existing S

endorsement applicants could likely become eligible to drive a school bus.  (Tr. at

95:11-95:19).  Thereafter, State Police Trooper Michael Penrose ("Trooper

Penrose") testified that school buses must undergo an annual State Police

inspection, concomitant with the standard state inspection required for all

commercial and passenger vehicles.  (Tr. at 118:9-118:23).

CBM introduced testimony from Executive Director Aaron Ziebarth ("Mr.

Ziebarth"), who stated that seventeen of CBM's thirty volunteer bus drivers are not

presently S endorsement certified.  (Tr. at 30:9-30:19).  Mr. Ziebarth testified that if

CBM required all volunteer drivers to obtain S endorsements, the scope of its

release time programs would decrease significantly.  (Tr. at 44:14-44:19).  He

explained as follows:

> We're highly dependent upon volunteers, and that's been
> our model for many years. . . . What I have personally
> experienced in the thirteen years that I've been here is
> our people are busier than they have ever been before,
> and because of that I anticipate that asking them to do
> additional requirements that they in particular feel are
> not helpful or appropriate will . . . detract from our ability
> to keep them involved. . . . That's what several of them
> have told me, and here is then my other observation is
> [sic] when Pennsylvania implemented new standards for
> background checks which changed what we did, we had a

> variety of our volunteers no longer want to be involved
> because of some of the additional steps that they had to go
> through.

(Tr. at 45:1-45:21).

Mr. Ziebarth estimated that without injunctive relief, CBM would be required to incur a prohibitive weekly cost of $5200 for contracted transportation services to support its release time programs. (Tr. at 33:16-34:1). Further, Mr. Ziebarth projected the cost of modifying CBM's buses to comply with school bus safety regulations to be $50,000. (Tr. at 36:1-36:6). On cross examination, he acknowledged that this figure would be significantly reduced were CBM no longer required to paint their buses national school bus yellow. (Tr. at 36:18-37:1). CBM proffered no documentary support for Mr. Ziebarth's calculations.

Mr. Ziebarth explained that since September 23, 2015, CBM has relied on donated services to continue operating its release time programming. (Tr. at 23:14-23:18). He testified that several of the donations would expire on Friday, November 27, 2015, leaving certain programs with no transport mechanism—and no contingency plan—as of Monday, November 30, 2015. (Tr. at 24:16-24:23).

CBM next presented testimony from Ms. Browder, a CBM volunteer of eighteen years, who echoed Mr. Ziebarth's concerns with respect to disincentives to volunteerism. (Tr. at 56:1-56:3). Ms. Browder previously worked for Chambersburg Area School District as a school bus driver for five years, and as a licensed school bus driver instructor for an additional five years. (Tr. at 54:12-55:20). According to Ms. Browder, CBM volunteers seeking an S endorsement would be required to assume the following out-of-pocket expenses:

8

> Now it would range from . . . $40 to $160 for the in class
> training, and then you'd have to pay a certified instructor
> to train you on the bus, which could entail mileage on the
> bus [typically at a rate of $1 per mile], rental of the bus,
> and then hourly wage for the instructor to instruct you,
> plus your yearly physical, which . . . my last one was $95.

(Tr. at 58:1-58:7). When asked whether a rule mandating S endorsements for all

drivers would negatively impact CBM's ability to retain volunteers, Ms. Browder

testified as follows:

> I definitely think it would create a problem, because just
> working in the industry myself, these drivers that have to
> do it to run a school bus complain enough when they have
> to recert[ify]. So if they're doing it on a volunteer basis, I
> can't see that they would keep it up.

(Tr. at 65:18-65:22). Ms. Browder further stated that to reacquire her instructor's

license for the purpose of training other CBM volunteer drivers, she would be

required to undergo twenty hours of classroom training at the cost of approximately

$400. (Tr. at 67:22-68:6, 75:1-75:7).

## III.   Legal Standard

Preliminary injunctive relief is an extraordinary remedy and should issue in

only limited circumstances. See Am. Tel. & Tel. Co. v. Winback & Conserve

Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994). Four factors inform a district

court's decision whether to issue a preliminary injunction: "(1) whether the movant

has shown a reasonable probability of success on the merits; (2) whether the

movant will be irreparably injured by denial of the relief; (3) whether granting

preliminary relief will result in even greater harm to the nonmoving party; and (4)

whether granting preliminary relief will be in the public interest." Am. Express

Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012)

(quoting Crissman v. Dover Downs Entm't Inc., 239 F.3d 357, 364 (3d Cir. 2001)).

The moving party bears the burden of establishing that the greater balance of these

factors weighs in its favor.  Constructors Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 815

(3d Cir. 1978).  A movant's failure to demonstrate a likelihood of success on the

merits or irreparable harm in the absence of preliminary injunctive relief renders a

preliminary injunction inappropriate.  Grill v. Aversa, 908 F. Supp. 2d 573, 591 (M.D.

Pa. 2012).

## IV.   Discussion

### A.   Reasonable Probability of Success on the Merits

To establish a reasonable probability of success on the merits, the moving

party must produce sufficient evidence to satisfy the essential elements of the

underlying cause of action.  See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir.

1980).  The district court must examine the legal principles controlling the claim

and the potential defenses available to the opposing party.  See BP Chems. Ltd. v.

Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000).  The mere

possibility that a claim might be defeated does not preclude a finding of probable

success if the evidence clearly satisfies the essential prerequisites of the cause of

action.  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).

The court need only determine that the moving party would likely succeed on at

least one claim to issue injunctive relief.  See Trefelner *ex rel.* Trefelner v. Burrell

Sch. Dist., 655 F. Supp. 2d 581, 590 (W.D. Pa. 2009); First Health Grp. Corp. v. Nat'l

Prescription Adm'rs, Inc., 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).

Under the Pennsylvania Declaratory Judgments Act, a court may declare the rights, status, or legal relations of parties in the case of an actual controversy. 42 PA. CONS. STAT. § 7532.  An action premised upon a question of statutory construction may proceed thereunder if the plaintiff demonstrates "imminent and inevitable litigation, and a direct, substantial and present interest."  Buehl v. Beard, 54 A.3d 412, 419 (Pa. Commw. Ct. 2012), aff'd, 91 A.3d 100 (2014); see 42 PA. CONS. STAT. § 7533.  Courts are to construe the dictates of the Act liberally.  42 PA. CONS. STAT. § 7541(a).  CBM has plainly demonstrated a material interest in an active controversy.  See Buehl, 54 A.3d at 419.

CBM asserts that it "has a clear right to relief from [defendants'] misinterpretation of . . . 75 PA. CONS. STAT. § 4551," the enabling legislation which empowers PennDOT to regulate school bus safety.  (Doc. 9 at 10).  As noted *supra*, § 4551(a) circumscribes PennDOT's rule making authority to vehicles which are "owned by or under contract with any school district or parochial or private school."  75 PA. CONS. STAT. § 4551(a).  CBM argues that its buses are not within the scope of this authority.  (Doc. 9 at 10).

Defendants acknowledge that the language of § 4551 does not encompass CBM's buses.  (Doc. 19 at 13).  Defendants contend, however, that PennDOT promulgates 67 PA. CODE § 171 "in accordance with the provisions of [§ 4551] *and* four other" Vehicle Code statutes: to wit, 75 PA. CONS. STAT. § 4103 (promulgation of vehicle equipment standards); § 4552 (general requirements for school buses); § 4553 (general requirements for other vehicles transporting school children); and

11

§ 6103 (promulgation of rules and regulations by PennDOT).  (Doc. 19 at 13).

Defendants next provide the full text of each statutory provision and summarily

conclude that "the school bus safety regulations contained in [§] 171 have been

properly promulgated in accordance" with all five statutes.[2]  (Doc. 19 at 16).

Upon careful consideration of the cited provisions of the Vehicle Code, the

court divines no conflict between the terms stated therein and ascertains no grant

of authority which would expand the scope of PennDOT's rule making under

§ 4551.  The court's interpretation of § 4551 is informed by Pennsylvania's Statutory

Construction Act.  1 PA. CONS. STAT. § 1501 *et seq*.  As stated therein, when the

words of a statute are clear and unambiguous, a court need not traverse the plain

meaning of the statute "under the pretext of pursuing its spirit."  Id. § 1921(b); see

Bayada Nurses, Inc. v. Dep't of Labor & Indus., 8 A.3d 866, 880-81 (2010).  In the

instant case, the plain language of § 4551 conveys a clear and definite meaning:

PennDOT is directed to regulate school buses which are "owned by or under

contract with any school district or parochial or private school."  75 PA. CONS. STAT.

§ 4551(a).  Defendants concede that CBM's buses are not within the purview of this

---

[2] Defendants additionally assert that CBM's First Amendment claim is barred
by the Eleventh Amendment.  (Doc. 19 at 18-20).  Defendants aver that the court is
therefore precluded from exercising jurisdiction herein.  (Id. at 20).  The court
declines to consider CBM's constitutional claim for purposes of addressing the
instant motion, as CBM need only demonstrate a reasonable likelihood of success
on the merits of one claim.  See Trefelner, 655 F. Supp. 2d at 590; First Health, 155
F. Supp. 2d at 234.  Further, defendants' sovereign immunity defense as to CBM's
constitutional claim does not deprive the court of removal jurisdiction over the case.
Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998).

enabling language. (Doc. 19 at 13). Accordingly, CBM has established a likelihood

of success on the merits with respect to this claim.

### B. Irreparable Harm to CBM

Irreparable injury is harm of such an irreversible character that prospective

judgment would be inadequate to make the moving party whole. See Anderson v.

Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight,

Inc., 882 F.2d 797, 801 (3d Cir. 1989). The mere risk of injury is not sufficient to meet

this standard. Rather, the moving party must establish that the harm is imminent

and probable. Anderson, 125 F.3d at 164. Harm that may be contained effectively

only through immediate injunctive relief is properly deemed "irreparable." Instant

Air Freight, 882 F.2d at 801.

CBM contends that it will suffer irreparable harm if the court denies its

request for injunctive relief in light of the heightened licensure requirements

applicable to school bus drivers. (See Doc. 9 at 7). Specifically, CBM asserts that

"[t]he requirement of an 'S' endorsement would have the natural effect of

eliminating most volunteers from participating in the release time program." (Id.)

Defendants vilipend CBM's entreaty as "general speculation[] about how the

number of volunteers assisting the organization would drop." (Doc. 19 at 22). The

record supports CBM's position.

Mr. Ziebarth, CBM's Executive Director, testified that CBM relies profoundly

on its 1300-person volunteer base to operate release time programming and to

provide instruction free of charge. (Tr. at 6:10-6:16, 8:1-8:5, 45:1-45:21). Thirty

volunteers drive CBM's buses, and only seventeen hold S endorsement licenses.

(Tr. at 30:9-30:19). Ms. Browder described the onerous training requirements associated with obtaining S endorsement certification, highlighting the significant number of hours and the substantial financial outlay. (Tr. at 56:19-58:18).

Both Mr. Ziebarth and Ms. Browder testified with certitude that CBM would lose volunteer drivers immediately upon requiring S endorsement licenses. (Tr. at 45:1-45:21, 65:18-65:22). From this testimony, it is easily inferred that CBM would struggle to attract new volunteer drivers, further diminishing an already reduced pool of volunteers over time. The court finds that Mr. Ziebarth and Ms. Browder testified credibly, each basing their opinions on prolonged involvement with CBM: thirteen and eighteen years, respectively. (Tr. at 45:1-45:21, 56:1-56:3).

Relying upon Mr. Ziebarth's and Ms. Browder's testimony, the court credits Mr. Ziebarth's assertion that continued enforcement of school bus regulations against CBM "would curtail [CBM's] program[s] significantly." (Tr. at 31:18-31:23). Indeed, CBM's inability to retain volunteer drivers could disrupt its release time programming in a proximate and irreversible manner. Under the totality of the evidence, the court finds that CBM will likely suffer irreparable injury unless it receives immediate relief. The potential harm to CBM implicates the stability, longevity, and ambit of its release time programming. This factor supports a *caesura* of regulatory enforcement for the pendency of the instant suit.

## C. Balancing of Hardships

To determine whether granting preliminary injunctive relief would result in greater harm to the nonmovant, the court must examine the terms of the proposed injunction, consider the respective positions of the parties, and assess the

ramifications of the requested relief.  See Novartis Consumer Health, Inc. v.

Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 596-97 (3d Cir.

2002).  Injunctive relief should generally be denied if the potential harm to the

nonmovant outweighs the potential benefits to be bestowed upon the movant.  See

Novartis, 290 F.3d at 596-97.

CBM argues that the balance of the equities favors enjoining defendants from

enforcing the disputed Code provisions against CBM.  (Doc. 9 at 9).  CBM avers that

"there is no injury to PennDOT or [the State Police], as their interests have been

adequately addressed through standard state inspections . . . ."  (Id.)  The court

agrees.  In their memoranda of law, defendants have not argued that they will incur

any harm if the court grants CBM's motion.  Further, the court observes that the

requested injunction will not impair defendants' ability to enforce school bus safety

regulations separate and apart from the matter *sub judice*.  Hence, the balancing of

the hardships weighs in favor of preliminary injunctive relief.

### D.    Public Interest

The public interest inquiry requires the court to look beyond the parties to

gauge the preliminary injunction's potential impact on the populace.  See Novartis,

290 F.3d at 596-97.  Specific, tangible effects on third parties should constitute the

focus of the court's determination.  See Council of Alt. Political Parties v. Hooks,

121 F.3d 876, 883-84 (3d Cir. 1997).

CBM contends that its continued compliance with all generally applicable

commercial vehicle regulations preserves public safety.  (Doc. 9 at 12).  At the

hearing, the parties stipulated that each of CBM's fourteen buses has passed state

inspection.  (Tr. at 11:10-11:14; <u>see</u> Ex. D-1).  Further, Mr. Ziebarth testified that

CBM has transported students to and from release time programs since 1967,

without a single vehicular accident on record.  (Tr. at 4:17-4:18, 13:16-13:18).

Defendants counter that harm may occur to "children being transported in school

buses which do not meet . . . minimum safety requirements . . . ." (Doc. 19 at 22).

The court agrees with CBM that defendants have proffered no evidence

which would tend to establish that CBM's buses, volunteer drivers, transportation

protocols between schools and program sites, or general operating procedures are

likely to cause harm to students.  Beyond generalities, defendants fail to explain

how a preservation of the forty-eight-year status quo for the duration of the instant

litigation might adversely affect third parties.  The court concludes that the public

interest is best served by imposition of a preliminary injunction.

V.    **Conclusion**

CBM's motion (Doc. 8) for preliminary injunction will be granted.  An

appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      December 2, 2015